UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JACOB BUTCHER, : | |
| : | CIVIL ACTION |
| Plaintiff, : | |
| : | No. |
| v. : | |
| : | |
| J.S.T. CORPORATION, : | |
| : | |
| Defendant. : | |
| : | |

## COMPLAINT

Jacob Butcher ("Plaintiff" or "Mr. Butcher"), by and through his undersigned counsel, brings this Complaint against his former employer J.S.T. Corporation ("Defendant" or "JST") and alleges as follows:

## INTRODUCTION

1. This is an action for religious discrimination, failure to accommodate, and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000(e) *et seq*. ("Title VII"), and the Pennsylvania Human Relations Act, 43 P.S. §§ 951 *et seq*. ("PHRA").

2. Mr. Butcher is a practicing Christian whose faith informs his understanding of life, including matters of sex and gender.

3. For nearly twenty-four (24) years, Mr. Butcher was a loyal, high-performing employee of JST with a spotless disciplinary record.

4. In early November 2024, before the start of his shift, Mr. Butcher engaged in a private conversation with two Christian co-workers about gender identity and transgender issues from a Christian perspective.

1

5. The discussion was mutual, respectful, and not directed at any particular individual or group.

6. JST seized upon this private religious conversation, initiated an "investigation," and quickly removed Mr. Butcher from the workplace and placed him on leave.

7. When Mr. Butcher questioned how a private religious discussion between like-minded co-workers could violate company policy, JST branded him as aggressive, insubordinate, and terminated his employment.

8. JST never attempted to accommodate Mr. Butcher's sincerely held religious beliefs or to engage in any good-faith interactive process.

9. JST's decision to fire a 24-year, exemplary employee for a brief, respectful religious discussion—and for questioning whether he had done anything wrong—constitutes unlawful discrimination and retaliation.

10. As a direct and proximate result of JST's unlawful conduct, Mr. Butcher has suffered lost wages and benefits, emotional distress, humiliation, and other consequential damages.

## PARTIES

11. Plaintiff Jacob Butcher is an adult individual residing in Pennsylvania.

12. At all relevant times, Mr. Butcher was employed by JST at its facility in Harrisburg, Pennsylvania.

13. Defendant J.S.T. Corporation is an Illinois business corporation with its principal place of business at 1957 South Lakeside Drive, Waukegan, Illinois 60085.

14. JST also operates a facility located at 3700 Chambers Hill Road, Harrisburg, Pennsylvania 17111, which is where Mr. Butcher worked.

15. At all relevant times, JST employed more than fifteen (15) employees and was an

"employer" within the meaning of Title VII and the PHRA.

## JURISDICTION AND VENUE

16. This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 because Plaintiff's claims arise under Title VII.

17. The Court has supplemental jurisdiction over Plaintiff's PHRA claims pursuant to 28 U.S.C. § 1367(a) because they form part of the same case or controversy as his federal claims.

18. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the events giving rise to Plaintiff's claims occurred at Defendant's facility in Harrisburg, Pennsylvania, which is located within the Middle District of Pennsylvania.

19. This Court has general personal jurisdiction over JST pursuant to 42 Pa. C.S.A. § 5301(a)(2) based on JST's registration with the Pennsylvania Department of State as a foreign business corporation.

20. This Court also has personal jurisdiction over JST pursuant to 42 Pa. C.S.A. § 5322(a)(1)-(4) based on (1) JST's transacting business in Pennsylvania for the purpose of realizing pecuniary benefit, (2) contracting to supply services in Pennsylvania, (3) causing harm by an act or omission in Pennsylvania, and (4) causing harm by an act or omission in Pennsylvania by an act or omission outside of Pennsylvania, and because Plaintiff's claims arise out of JST's above transactions, acts or omissions and business activities relating to Plaintiff within Pennsylvania.

## ADMINISTRATIVE EXHAUSTION

21. Plaintiff exhausted his administrative remedies by timely filing a Charge of Discrimination against JST with the Equal Employment Opportunity Commission ("EEOC"), which was dual-filed with the Pennsylvania Human Relations Commission ("PHRC"), which Charge alleged religious discrimination, failure to accommodate, and retaliation.

22. The EEOC issued a Notice of Right to Sue, which Plaintiff received on or about September 15, 2025.

23. Plaintiff has commenced this action within ninety (90) days of his receipt of the Notice of Right to Sue.

24. Plaintiff has satisfied all conditions precedent to bringing his claims under Title VII and the PHRA

## FACTS COMMON TO ALL CLAIMS

### Mr. Butcher's Exemplary 24-year Career

25. JST hired Mr. Butcher on or about August 7, 2000, as a tool-and-die maker in its molding department in Harrisburg, Pennsylvania.

26. Mr. Butcher was among the earliest hires in that department and took pride in helping to build and grow the operation over more than two decades.

27. Throughout his employment, Mr. Butcher consistently received positive performance reviews, received merit-based increases, and was recognized as a highly skilled and reliable employee.

28. Mr. Butcher had no disciplinary history of any kind—no write-ups, warnings, suspensions, or other corrective actions—during his twenty-four years of employment with JST.

29. Supervisors and co-workers alike regarded Mr. Butcher as respectful, dependable, and committed to his work.

### Mr. Butcher's Christian Faith and Workplace Conversation

30. Mr. Butcher is a practicing Christian whose sincerely held religious beliefs influence his decisions, his relationships, and his understanding of issues such as sex, gender, and identity.

31. Mr. Butcher's faith is central to his life, but he has always endeavored to discuss his beliefs in a respectful, non-confrontational way.

32. On or about November 4, 2024, at approximately 6:30 a.m., before his shift began, Mr. Butcher was seated at his desk in the engineering department, speaking privately with two co-workers, Jeff Bittler and Bill Danielewicz.

33. All three men are Christians and frequently discussed religious topics together at work during their employment with JST.

34. On that morning, they were discussing gender identity and transgender issues from a Christian worldview, including their belief that God created humans as male and female.

35. The conversation was mutual, calm, conversational, and not argumentative or confrontational.

36. Mr. Butcher and his coworkers Mr. Bitler and Mr. Danielewicz engaged in a conversation among themselves, regarding their shared faith in God and belief that God created human beings as male and female, and that individuals are called to live in accordance with the sex God assigned to them at birth.

37. Their conversation was not directed at any individual or group, or any other JST employee.

38. Mr. Butcher believed that he and his two co-workers were essentially alone in that area of the building and that their conversation would not be overheard by others.

**JST's Investigation**

39. Approximately one week later, on or about November 12, 2024, JST summoned Mr. Butcher to a meeting with multiple members of JST management, including, Kevin Lauret, Kevin Chabala, Cody Wynn, and Jorie Clifton.

40. During this meeting, JST managers questioned Mr. Butcher about his November 4th conversation and referred to it as a "religious conversation."

41. Mr. Butcher explained that he and his two co-workers regularly had religious discussions, that these conversations were mutual and respectful, and that his co-workers were not offended.

42. JST management recited a list of alleged statements about transgender individuals that they claimed had been made during the conversation, including characterizations that Mr. Butcher did not recall using.

43. Mr. Butcher acknowledged that he had discussed transgender issues from a Christian perspective but did not recall making the specific statements attributed to him and denied intending to demean or attack any individual or group.

44. JST did not identify who had complained, what words the complainant claimed to have heard, or how the November 4th conversation allegedly violated any JST policy.

45. Because JST management chose to be ambiguous about the nature of their investigation, Mr. Butcher formed the impression that one of his co-workers, Mr. Bitler or Mr. Danielewicz, had filed a complaint against him.

46. At the conclusion of the November 12th meeting, JST instructed Mr. Butcher to leave the facility and not return until further notice.

47. JST did not clarify whether Mr. Butcher was being placed on paid or unpaid leave and did not provide any written explanation of his status.

48. JST instructed Mr. Butcher to return for another meeting with JST's management on or about November 14, 2024.

49.     During this meeting, JST disclosed that the complaint did not originate from either of Mr. Butcher's two co-workers who participated in the conversation, but from an unidentified third person who allegedly overheard part of their discussion.

50.     JST management then told Mr. Butcher that he could return to work only if he signed a copy of JST's anti-harassment policy and completed "sensitivity" training.

51.     Mr. Butcher was willing to comply with company policies, and he signed the anti-harassment policy on the spot.

52.     Mr. Butcher raised reasonable concerns, however, about how JST's policy was being applied to private religious conversations among Christian co-workers.

53.     In response to Mr. Butcher's questions, a member of management smirked and stated, in substance, that an employee saying, "I voted for Kamala Harris" would be acceptable under JST's policy—implying that certain political viewpoints were protected while Mr. Butcher's faith-based views were not.

54.     This comment reinforced Mr. Butcher's perception that JST was applying a double standard that favored certain viewpoints and punished Christian expressions regarding sex and gender.

55.     Rather than address Mr. Butcher's legitimate concerns or consider how to accommodate his religious beliefs, JST management characterized his questions and objections as "insubordination" and "aggression."

56.     Mr. Butcher did not yell, threaten anyone, stand up in a menacing way, use profanity, or engage in any physical or disruptive behavior during the meeting.

57. He remained seated and spoke firmly but respectfully, expressing confusion and frustration at being investigated and disciplined for a private religious discussion with co-workers who were not offended.

58. During the November 14th meeting, JST managers also raised unrelated issues, including Mr. Butcher's routine practice of photographing molds and sending those photos to his supervisor using his company email—a practice that had never previously been identified as misconduct or as a security concern.

59. JST also focused on the fact that Mr. Butcher had briefly recorded part of a prior meeting on his cellphone.

60. When informed that recording without consent was not permitted, Mr. Butcher turned off the recording and Mr. Butcher explained that he had not understood the legal restrictions and did not intend to violate any law or policy.

61. When JST's management warned him that any future recording would result in "immediate termination," Mr. Butcher expressed fear that his mistake was being held over his head and remarked that he felt like this was being used against him.

62. JST later distorted his reaction as Mr. Butcher threatening to blackmail JST even though he made no threats and was simply trying to protect his job by navigating a difficult meeting with management where his religious beliefs were being scrutinized.

63. At the end of the November 14th meeting, JST told Mr. Butcher that he could return to work after signing the policy and completing the training.

64. Given the emotional toll of the meeting, Mr. Butcher requested to use personal time for the remainder of that day, which JST approved.

65.     Later that same day, however, JST abruptly changed course and informed Mr. Butcher that he was being placed on "administrative leave."

### JST Terminates Mr. Butcher's Employment

66.     On or about November 16, 2024—just days after the November 4th conversation came to JST's attention and within roughly 48 hours of the November 14th meeting—JST sent Mr. Butcher an email notifying him that his employment was terminated.

67.     JST terminated Mr. Butcher despite his having no prior disciplinary history and never before being characterized as anything other than a cooperative, high-performing employee.

68.     JST did not meet with Mr. Butcher again before terminating him, did not propose any accommodation for his religious beliefs, and did not attempt to identify any way to allow him to continue working at JST while respecting both his faith and JST's policies.

69.     JST never engaged in a meaningful interactive process to explore accommodations for Mr. Butcher's religious beliefs, such as confirming that faith-based discussions would be limited to willing participants, changing locations, or clarifying guidelines for private conversations.

70.     Instead, JST removed Mr. Butcher from the workplace, interrogated him about his religious views, demanded that he accept its characterization of his beliefs as "harassment," mandated sensitivity training, insisted he re-acknowledge JST's anti-harassment policy as a condition of continued employed—which he did—and then fired him when he respectfully disagreed that his speech was a violation of JST's policies.

**JST's Pretext and Discriminatory Motive**

71. Now, JST claims that during the November 14th meeting, Mr. Butcher was hostile, intimidating, belittling, aggressive, and engaged in behavior that caused JST management to fear for their safety.

72. However, JST's documentation of its November 14th meeting with Mr. Butcher fails to mention any of the above types of behavior.

73. JST's own description of Mr. Butcher's performance—spanning nearly twenty-four years—is inconsistent with its sudden portrayal of him as aggressive and intimidating based solely on his reaction to being accused of policy violations for a private religious conversation.

74. The timing is striking: Only after JST confronted Mr. Butcher about his Christian beliefs regarding gender, removed him from the workplace, and was subjected to potential legal scrutiny did JST begin to recast him as a problematic employee.

75. The vague, conclusory labels used to justify Mr. Butcher's termination are not supported by specific, contemporaneous facts.

76. JST does not identify any threats, physical acts, or disruptions by Mr. Butcher, either on November 4th, November 12th, or November 14th.

77. By contrast, JST treated previously accepted practices (such as Mr. Butcher using his cellphone to send photos of molds to his JST email account for his JST supervisor William Widener to use in communicating with vendors) as sudden "security" concerns only after deciding to terminate Mr. Butcher, further suggesting that these reasons were manufactured after the fact.

78. JST's response to Mr. Butcher's religious conversation, its interrogation of his beliefs, its double standard regarding acceptable viewpoints, and its refusal to consider a

10

reasonable accommodation all demonstrate discriminatory animus toward Mr. Butcher's Christian faith and retaliation when he opposed what he believed to be an unfair and biased application of company policy.

## DAMAGES

79. As a direct and proximate result of Defendant's unlawful conduct, Mr. Butcher has suffered loss of income and benefits, including back pay and loss of future earning capacity.

80. Mr. Butcher has also suffered emotional pain, mental anguish, embarrassment, humiliation, loss of reputation, and loss of enjoyment of life.

81. Defendant's actions were willful, malicious, and/or taken with reckless indifference to Mr. Butcher's federally protected rights, entitling him to punitive damages.

## COUNT I
### Religious Discrimination – Disparate Treatment
### Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.)

82. Plaintiff incorporates by reference the foregoing paragraphs as though set forth fully herein.

83. Plaintiff is a member of a protected class under Title VII based on his sincerely held Christian religious beliefs.

84. Plaintiff was qualified for his position and performed his job at or above expectations throughout his 24-year tenure with JST.

85. Plaintiff suffered adverse employment actions when, among other things, JST (1) placed Mr. Butcher on administrative leave and (2) terminated his employment on or about November 16, 2024.

86. Defendant's decision to terminate Plaintiff was motivated, at least in part, by his religious beliefs and his religious expression, including his November 4, 2024 discussion of gender identity from a Christian perspective.

87. Defendant treated Plaintiff less favorably than similarly situated employees who did not share or express his religious beliefs and who engaged in conversations expressing different political or ideological viewpoints.

88. Defendant's stated reasons for terminating Plaintiff—such as intimidation and aggressive behavior—are pretextual and were offered after the fact to conceal unlawful discrimination.

89. Upon information and belief, Defendant's willful discrimination is further evidenced by its more recent Reduction in Force that resulted in the termination of several other JST employees who expressed their Christian faith in the workplace.

90. Defendant's conduct constitutes unlawful religious discrimination in violation of Title VII.

91. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered the damages described above.

## COUNT II
### Failure to Accommodate Religious Beliefs
### Title VII of the Civil Rights Act of 1964

92. Plaintiff incorporates by reference the foregoing paragraphs as though set forth fully herein.

93. Plaintiff's sincerely held religious beliefs, including his Christian beliefs concerning sex and gender, conflicted with Defendant's application of its anti-harassment policy as it was used to restrict private, consensual religious discussions among co-workers.

94. Plaintiff communicated his beliefs and his concerns about the application of the policy during the November 12 and November 14 meetings, thereby placing Defendant on notice of a conflict between his religious beliefs and Defendant's policies and workplace expectations.

95. Defendant did not engage in a good-faith interactive process to identify any

reasonable accommodation of Plaintiff's religious beliefs.

96. Defendant did not consider or offer reasonable accommodations, such as clarifying where and with whom religious conversations could take place, or otherwise adjusting expectations to allow Plaintiff to practice and discuss his faith in a manner that did not impose an undue hardship.

97. Instead, Defendant removed Plaintiff from the workplace and terminated his employment rather than attempt to reasonably accommodate his religious beliefs.

98. Defendant's failure to provide a reasonable accommodation for Plaintiff's religious beliefs, despite having notice and the ability to do so without undue hardship, violates Title VII.

99. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered the damages described above.

## COUNT III
### Retaliation
### Title VII of the Civil Rights Act of 1964

100. Plaintiff incorporates by reference the foregoing paragraphs as though set forth fully herein.

101. Plaintiff engaged in protected activity under Title VII when he:

   a. Expressed his sincerely held religious beliefs regarding gender from a Christian perspective; and

   b. Objected to Defendant's characterization of his private religious conversation as "harassment" and questioned the unequal treatment of his faith-based views compared to other viewpoints.

102. Plaintiff reasonably believed that Defendant's treatment of his religious

expression and its application of its anti-harassment policy were discriminatory.

103. Within days of Plaintiff's protected activity, Defendant placed him on administrative leave and then terminated his employment.

104. The close temporal proximity between Plaintiff's protected activity and his termination, combined with Defendant's shifting and exaggerated reasons for termination, supports a causal connection between the protected activity and the adverse action.

105. Defendant terminated Plaintiff because he engaged in protected activity, in violation of Title VII's anti-retaliation provisions.

106. As a direct and proximate result of Defendant's retaliation, Plaintiff has suffered the damages described above.

## COUNT IV
### Religious Discrimination – Disparate Treatment and Failure to Accommodate
### Pennsylvania Human Relations Act (43 P.S. § 951 et seq.)

107. Plaintiff incorporates by reference the foregoing paragraphs as though set forth fully herein.

108. At all relevant times, Defendant was an "employer" and Plaintiff was an "employee" within the meaning of the PHRA.

109. The facts described above constitute religious discrimination and failure to accommodate under the PHRA for the same reasons set forth with respect to Title VII.

110. Defendant's conduct violated the PHRA's prohibitions against discrimination based on religion, including the requirement that employers reasonably accommodate employees' sincerely held religious beliefs absent undue hardship.

111. As a direct and proximate result of Defendant's PHRA violations, Plaintiff has suffered the damages described above.

## COUNT V
### Retaliation
### Pennsylvania Human Relations Act

112. Plaintiff incorporates by reference the foregoing paragraphs as though set forth fully herein.

113. Plaintiff engaged in protected activity under the PHRA when he opposed what he reasonably believed to be religious discrimination and challenged Defendant's application of its policies to his religious expression.

114. Defendant subjected Plaintiff to adverse actions, including administrative leave and termination, because of his protected activity.

115. Defendant's conduct constitutes unlawful retaliation in violation of the PHRA.

116. As a direct and proximate result of Defendant's retaliation, Plaintiff has suffered the damages described above.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendant and award the following relief:

A. Reinstatement to his former position or to a comparable position, with full seniority and benefits;

B. Back pay, including lost wages, benefits, and all forms of compensation, with interest;

C. Front pay in lieu of reinstatement, if reinstatement is not feasible;

D. Compensatory damages for emotional distress, humiliation, loss of reputation, and loss of enjoyment of life;

E. Punitive damages under Title VII for Defendant's willful and/or reckless disregard of Plaintiff's federally protected rights;

F. Costs of suit, including reasonable attorneys' fees and expenses, pursuant to Title VII and

the PHRA;

G. Pre-judgment and post-judgment interest as allowed by law; and

H. Such other and further legal and equitable relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury an all issues so triable.

Respectfully submitted,

**SMITH BUKOWSKI, LLC**

Dated:  December 11, 2025          By: /s/ Jeffrey D. Bukowski
Jeffrey D. Bukowski, Esquire
Attorney I.D. No. 76102
JBukowski@SmithBukowski.com
Nathan L. Hopkins, Esquire
Attorney I.D. No. 328162
NHopkins@SmithBukowski.com
1050 Spring Street, Suite 1
Wyomissing, PA 19610
(610) 685-1600

*Attorneys for Plaintiff Jacob Butcher*